IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Board of Education of the                                    Case No. 3:07CV3631
    Toledo City School District,

        Plaintiff

    v.                                                                ORDER

Joanne E. Horen, et al.,

        Defendants

      This is one of a series of lawsuits between plaintiff Board of Education of the City of Toledo

Public Schools (Board) and defendants, Joanne and Glenn "Scott" Horen, parents of D.H., a severely

disabled girl who attended Toledo Public Schools (TPS). In this suit, the Board appeals several

findings by a State Level Review Officer (SLRO) that the Board has failed to provide D.H. with

rights guaranteed by the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400 *et*

*seq*.

      The Board takes issue with several determinations in the SLRO's opinion. The Horens

disagree and urge me to uphold the SLRO's findings.

      Jurisdiction is proper under 28 U.S.C. § 1331.

      Pending are: 1) defendants' motion for summary judgment [Doc. 32]; 2) plaintiff's motion

for partial summary judgment [Doc. 35]; and 3) plaintiff's motion to strike [Doc. 46].

For the following reasons, defendants' motion for summary judgment [Doc. 32] shall be granted in part and denied in part, plaintiff's motion for partial summary judgment [Doc. 35] shall be granted, and plaintiff's motion to strike [Doc. 46] shall be granted.[1]

### Background[2]

D.H. was born on September 3, 1998. D.H. has a congenital malformation syndrome called "4p-" or "Wolf-Hirschhorn" Syndrome, caused by the absence of the short arm of chromosome 4. As a result, D.H. has numerous physical defects and a mental capacity "in the profound range of mental retardation." [Doc. 1-10, at 434]. She is largely immobile and non-communicative, and as such depends heavily on others. She is "disabled" under IDEA and relevant Ohio law.

D.H. also suffers from a blood disorder, and seizures caused by her genetic condition. Her seizures affect her entire body – including her brain – and require immediate administration of oxygen, careful suction of excess saliva, rectal administration of Diastat (an anticonvulsive), and a second Diastat administration fifteen minutes after the first. Non-medical personnel may administer Diastat with adequate training. The Horens are to be called immediately; 911 may be called as well.

D.H.'s seizures have occurred mostly at night, though at times in the morning or afternoon. Between 2004 and 2006, she suffered between one and two-dozen seizures. In 2006, she suffered seizures in January, April and October. The January seizure required hospitalization. Her seizures

---

[1] Plaintiff filed a motion to strike Exhibit B to defendants' memorandum to their motion for summary judgment on December 15, 2009. [Doc. 46]. Defendants did not respond. As it is unopposed, plaintiff's motion is therefore granted.

[2] I paint here, in broad stroke, only the most relevant aspects of D.H.'s background, as the full administrative record consists of eight binders, two file folders, and over 2,500 pages of testimony.

have become more infrequent as she has aged, and the only seizure she suffered at school was during the 2004-2005 school year. Her pediatrician is Dr. Michael Pappas, M.D.

D.H. resides with her parents in Toledo, Ohio, and attended the EduCare Center TPS Preschool (EduCare) from 2001 until 2006. EduCare is the TPS center for disabled and medically fragile children. It has two full-time nurses and generally fewer than twenty students, mostly non-ambulatory. EduCare has no non-disabled students. D.H.'s placement at EduCare stemmed from her need for close observation and for medical services, particularly for her seizure disorder.

From 2001 to 2003, D.H. attended preschool at EduCare in teacher Bridget Harding's class.

In 2003, TPS performed a multi-factored evaluation (MFE) of D.H.'s abilities and then assigned her to begin primary classes at EduCare under teacher Kellie Fuelling. In its classes, EduCare has approximately eight disabled students per class, along with a Special Education teacher and two para-professional aides. Occupational, physical and speech therapists also assisted the students regularly. Teachers and therapists at EduCare routinely made personal notes in the form of tally sheets and otherwise to help keep track of each student's daily activities and achievements. These individuals testified that the sheets were temporary memory aides that the creator alone would personally use to compile a student's official progress reports and Medicaid forms. The sheets were then thrown away, without being seen by or accessible to other individuals.

D.H. remained in Fuelling's class until she left EduCare in 2006. Nancy LeBlanc was D.H.'s occupational therapist, Jean Dykyj was D.H.'s physical therapist, and Chris Moore was D.H.'s speech therapist. Douglas Felt was an EduCare school psychologist. During this period, Mary Therese Reuss was the Board's Special Education Supervisor for the area of Toledo where EduCare is located.

3

On December 1, 2003, members of D.H.'s "individualized education program" (IEP) team met and created her IEP for the following year. [Doc. 3, Ex. Z]. Joanne Horen, among others, attended. That IEP remained applicable from December 1, 2003, to December 1, 2004.

Because D.H. showed significant progress over the course of the 2003-2004 school year, the Board offered her four hours of consultative services during the 2004 Summer. The Board never, however, provided these services due to confusion over D.H.'s summer situation.

The Board then offered D.H. five hours of physical therapy and five hours of occupational therapy during the 2004-2005 school year to compensate for the promised (but not provided) services in Summer 2004. D.H. subsequently received 10.25 hours of compensatory services during the 2004-2005 school year from LeBlanc and Dykyj. They provided D.H. with these services during her "down time," or otherwise so they would not interfere with her normal instruction.

During 2005, the Horens failed to respond to and then attend several meetings, including an IEP, notwithstanding the Board's efforts to include the Horens in those sessions.

On November 28, 2005, Felt performed a MFE of D.H.

On January 23, 2006, D.H.'s teachers and administrators held an IEP meeting. [Doc. 3, Ex. X]. Fuelling attempted to contact the Horens numerous times, including sending them a letter with possible times and an official invitation. In response, they asked in a letter dated January 20, 2006, to postpone the meeting until February, 2006. Due to the impending expiration of D.H.'s prior IEP, the IEP meeting occurred as scheduled. The Horens gave D.H.'s audiologist, Daniel Riley, who was to attend the IEP meeting, a letter outlining the Horens' thoughts for consideration at the IEP meeting.

The January, 2006, IEP team drafted D.H.'s 2006 IEP, but left it open for comments or changes. This IEP did not contain the same level of detail as prior IEPs regarding D.H.'s medical information, but still referenced her condition. The IEP further contained a change in the language describing D.H.'s placement, but this was solely due to newly implemented Ohio Department of Education guidelines. The IEP did not change D.H.'s placement.

On January 25, 2006, Fuelling responded to the Horens' January 20, 2006, letter by email. She proposed several dates to meet to discuss the January, 2006, IEP and set up a meeting with the Horens for the end of February.

On January 26, 2006, Reuss sent the Horens a letter explaining why the IEP incorporated certain of the Horens' requests, and why it did not include others. Her letter further requested an IEP meeting with the Horens in March or April, 2006, to rework the IEP in light of the newly implemented Ohio guidelines. The letter asked the Horens to respond with a date convenient to them.

On February 28, 2006, the Horens met with Fuelling, Reuss and the rest of the IEP team. The Horens expressed displeasure with the 2006 IEP and various aspects of D.H.'s education at EduCare. The meeting eventually became heated, and the parties decided to halt the meeting and reschedule. The Horens indicated they wanted to meet with Felt alone before any future IEP meetings.

In March, 2006, one of the EduCare nurses, Andrea Strzelecki, provided the Board with a written report detailing D.H.'s medical services over the past years and explaining D.H.'s condition. Strzelecki's report also summarizes D.H.'s needs in case of a seizure.

On March 27, 2006, the Board sent the Horens an official invitation to an IEP meeting on April 3, 2006, at 10:00 AM at EduCare.

5

The Board submits a record showing that the Horens called on March 30, 2006, to cancel the April 3, 2006, IEP meeting because they wanted to meet with only Felt. The Horens deny making this call.

On April 3, 2006, the Horens met with Felt and Reuss at 10:00 AM at EduCare. They discussed D.H.'s November 28, 2005, MFE. Reuss left the meeting after forty-five minutes because she had another meeting elsewhere. She testified that she believed that the MFE meeting would flow into the IEP meeting. She, however, did not mention to the Horens that the IEP meeting was still taking place that day. After Reuss left, the Horens continued to talk to Felt for some time and then left.

When Reuss returned from her other meeting, she found the IEP meeting underway without the Horens (or Felt). Those attending were: Reuss, Dykyj, LeBlanc, Moore and Fuelling. No one attests to telling the Horens that the April 3, 2006, IEP meeting was still taking place.

At the IEP meeting, the team members present reworked D.H.'s IEP under the new Ohio guidelines. The most significant decision was to change, effective August 30, 2006, D.H.'s placement from EduCare to a disabled-student classroom at Larchmont Elementary School (Larchmont). The participating team members believed that D.H. no longer needed medical services; accordingly, they found her "least restrictive environment" (LRE) for education to be Larchmont. The IEP contained no provision for special medical services at Larchmont.

Various members of D.H.'s IEP team – including Reuss and Fuelling – had discussed this possibility throughout early 2006, but no one had communicated this possibility to the Horens or sought their permission for the placement change.

6

Larchmont, unlike EduCare, is a normal elementary school with non-disabled and disabled children. It has Special Education classrooms. The classroom in which the team proposed to place D.H. was a Special Education classroom under teacher Brenda Maas. Maas taught eight students, all ambulatory, and several diagnosed with autism. Her classroom contained two para-professional aides and a tutor. Larchmont also offered occupational, physical and speech therapy. There were, however, only two days per week where nursing services were available. The nurses, moreover, had to take care of all 300 students at the school. With regard to D.H.'s needs in event of a seizure, neither Maas nor Larchmont's principal indicated they would be willing to administer Diastat rectally. Thus, only one of Larchmont's nurses would do so if D.H. suffered a seizure.

The Board states it sent the Horens a letter with a copy of the April 3, 2006, IEP on May 3, 2006. The Horens claim they did not receive notice of the placement change until May 26, 2006.

On August 28, 2006, the Horens filed a due process complaint under IDEA requesting an impartial due process hearing and alleging the Board committed numerous violations of Ohio and federal law, denying D.H. a free appropriate public education (FAPE). In this complaint, the Horens invoked D.H.'s right to "stay put" at her current placement, EduCare, as of that date.

Less than one week later, Thom Billau, the Board's Director of Student Services, responded to the Horens' due process complaint with a letter noting D.H.'s absence from EduCare and Larchmont. He offered the Horens a placement in either location, and asked the Horens to notify him of which placement they desired for D.H. while the litigation was pending.

On September 7, 2006, the Horens responded with a demand that Fuelling be removed from supervision or proximity to their daughter's education at EduCare before they would send D.H. to school. They otherwise indicated that EduCare would be their desired placement.

7

It is unclear what the result of this demand was, except that D.H. has remained home from school since then.

On September 8, 2006, the Board filed a response to the Horens' due process complaint.

Between November 28, 2006, and December 19, 2006, the Ohio Department of Education, Office for Exceptional Children's Independent Hearing Officer (IHO) heard argument between the Horens and the Board.

On January 30, 2007, the IHO issued his decision.

On March 14, 2007, both the Horens and the Board filed notices of appeal of the IHO's decision.

On October 5, 2007, the Ohio Department of Education, Office for Exceptional Children's SLRO issued her decision based on the parties' appeals of the IHO decision.

On November 21, 2007, the Board filed its complaint and notice of appeal of the SLRO's decision in this case.

The Board appeals the SLRO's determinations that: 1) the statute of limitations did not bar the Horens' "extended school year" (ESY) claim regarding Summer 2004; 2) D.H. was entitled to ESY, so any failure to provide ESY was a failure to provide D.H. with a FAPE; 3) the Board's provision of additional occupational and physical therapy to D.H. during the 2004-2005 school year undermined D.H.'s FAPE; 4) the Board did not appeal the IHO's finding that the April 3, 2006, meeting involved a procedural violation of D.H.'s IEP, and that the finding was correct; 5) the Board did not appeal the finding that the April 3, 2006, meeting's occurrence without the Horens constituted a substantive failure to provide D.H. with a FAPE, and that the finding was correct; 6) the LRE was EduCare; 7) the SLRO could properly admit Glenn Horen's affidavit to supplement

8

the record; 8) failure to provide the Horens with certain tally sheets violated IDEA; 9) the Board had

to provide D.H. with six months compensatory education for improper provision of compensatory

services during 2004-2005; and 10) the Board had to provide three months compensatory education

for failure to include the Horens in the April 3, 2006, IEP meeting.

### Standard of Review

In a federal lawsuit challenging an IDEA administrative decision, I "(I) shall receive the

records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party;

and (iii) basing [my] decision on the preponderance of the evidence, shall grant such relief as [I]

determine[] is appropriate." 20 U.S.C. § 1415(i)(2)(C). "The Supreme Court has construed this

provision to mean that an initial reviewing court should make an independent decision based on the

preponderance of the evidence but also should give 'due weight' to the determinations made during

the state administrative process." *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 849 (6th Cir.

2004) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982)).

In the context of a motion for summary judgment,[3] the Sixth Circuit has construed "due

weight" to mean that "the district court can[not] simply adopt the state administrative findings

without an independent re-examination of the evidence. Unless the re-examination revealed that no

material facts were in dispute, the district court would then have to weigh the evidence, which is

---

[3] "If[, however,] neither party had expressed a desire to put on evidence beyond that in the administrative record, as allowed by 20 U.S.C. § 1415(e)(2), the district court [can] decide[ a] case at the same stage in the proceedings, but such a decision would not [] be[] summary judgment." *Doe v. Metro. Nashville Pub. Schs.*, 133 F.3d 384, 387 n.2 (6th Cir. 1998).

Here, however, "[s]ummary judgment requires that there be no disputed issues of material fact; that the facts be viewed in the light most favorable to the non-movant; and that the movant be entitled to judgment as a matter of law [before I may grant summary judgment]." *Id.* (citing Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986)).

never appropriate at the summary judgment stage." *Metro. Nashville Pub. Schs.*, *supra*, 133 F.3d at

387.

A subsequent Sixth Circuit opinion clarified further:

We have also indicated that the weight due will vary, depending on whether the court is reviewing procedural or substantive matters and whether educational expertise is essential to the administrative findings.

With regard to procedural matters, a court should strictly review and IEP for procedural compliance, although technical deviations will not render an IEP invalid. .   .   .  Furthermore, if the procedural requirements of the IDEA are met, greater deference is to be afforded to the district's placement decision.

As for substantive issues, the preponderance of the evidence language in [IDEA, 20 U.S.C. § 1415(i)(2)(B), indicates]  .   .   .  the deference due to the administrative findings is less than that generally accorded to administrative decisions, whereby the court will uphold a decision if it is supported by 'substantial evidence.'

.   .   .  [W]e hold that administrative findings in an IDEA case may be set aside only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both. A court should defer to the administrative findings only when educational expertise is relevant to those findings and the decision is reasonable. By so deferring, 'due weight' will have been given to the state administrative proceedings. We also reiterate that, when there is a conflict between the holdings of the local and state hearing officers, the court must defer to the state hearing officer's decision in reviewing the record on appeal.

*Burilovich* ex rel. *Burilovich v. Bd. of Educ. of the Lincoln Consol. Schs.*, 208 F.3d 560, 566-67 (6th Cir. 2000) (internal footnotes, quotations and citations omitted).

In sum, I therefore "review[] IDEA cases under a modified de novo standard, meaning that

[I] may set aside administrative findings in an IDEA case only if the evidence before [me] is more

likely than not to preclude the administrative decision from being justified based on the agency's

presumed educational expertise, a fair estimate of the worth of the testimony, or both." *L.M.* ex rel.

*T.D. v. Bd. of Educ. of Fayette County, Ky.*, 478 F.3d 307, 312-313 (6th Cir. 2007) (internal citation

10

and quotation omitted). More weight, however, "is due to an agency's determinations on matters for which educational expertise is relevant." *Deal*, *supra*, 392 F.3d at 849.[4]

### Discussion

IDEA provides federal funds to assist states with the education of disabled students. 20 U.S.C. § 1411. In exchange for these funds, states must provide a "free appropriate public education to . . . to all children with disabilities residing in the State." *Id.* § 1412(a)(1). The state school system must develop an annual IEP for each child with a disability outlining the goals and services for the child. *Id.* § 1414(d). A team (IEP team) including the parents, teachers and administrators develops the IEP. *Id.* § 1414(d)(1)(B). The IEP team determines the child's placement based on his or her IEP. *Id.* § 1414(d). The child's placement must be at the LRE appropriate for the child. *Id.* § 1412(a)(5). In effect, this means that – if appropriate given the child's needs – a state should educate a disabled child in a location where that child can receive contact with non-disabled students. *McLaughlin* ex rel. *E.M. v. Holt Pub. Schs. Bd. of Educ.*, 320 F.3d 663, 671-72 (6th Cir. 2003).

IDEA also establishes procedural mechanisms by which children with disabilities or their parents may "present a complaint with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to such child[.]" 20 U.S.C. § 1415(b)(6)(A).

---

[4] I note, however, that I need only consider the evidence to which I am directed in a motion for summary judgment, regardless of whether other potentially relevant evidence exists somewhere in the record. *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 379 (6th Cir. 2007). I have no independent "duty to sift through the record in search of evidence to support a party's opposition to summary judgment [or the motion itself].'" *Id.* (internal quotation omitted).

11

The first step is the filing of such a complaint with the school board, after which the parents have a right to an "impartial due process hearing" conducted by the appropriate state or local educational agency. *Id.* § 1415(f). A state IHO presides over this hearing and receives evidence. *Id.* § 1415(f)(1)(A). Any party may appeal the result of the IHO hearing to an SLRO. *Id.* § 1415(g)(2). Further, any party seeking relief from the SLRO's decision may bring suit in the appropriate state or federal district court. *Id.* § 1415(i)(2)(A).

In reviewing an suit brought under IDEA, I perform a two-part analysis.[5] *Deal*, *supra*, 392 F.3d at 853.

First, I "must determine whether the school system has complied with the procedures set forth in the IDEA." *Id.* In assessing "procedural matters, [I] should strictly review an IEP for procedural compliance, although technical deviations will not render an IEP invalid." *Burilovich*, *supra*, 208 F.3d at 566 (internal quotation omitted). Such procedural violations must "cause[] substantive harm ... and thus constitute[] a denial of [a student]'s right to [a] FAPE," *Knable v. Bexley*, 238 F.3d 755, 764 (6th Cir. 2001), before I may "grant such relief as [I] determine[] is appropriate." 20 U.S.C. § 1415(i)(2)(C).

Second, I "must assess whether the IEP developed through those procedures was reasonably calculated to enable the child to receive educational benefits." *Deal*, *supra*, 392 F.3d at 853-54

---

[5] As to who bears the burden of proof, the Supreme Court has held: "The burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief." *Schaffer* ex rel. *Schaffer v. Weast*, 546 U.S. 49, 62 (2005). The Sixth Circuit has held that, in federal proceedings, "it is clear that parents have the burden of proving by a preponderance of the evidence that the IEP was inadequate." *Nack* ex rel. *Nack v. Orange City Sch. Dist.*, 454 F.3d 604, 609 (6th Cir. 2006). This is because the parents are usually the party challenging the student's IEP. *Id.*

In these proceedings, the Horens have been the party challenging the IEPs, so they bear the burden of proof to the extent that they do so, notwithstanding the fact that they succeeded on their claims below. *Id.*

(internal citations omitted). "If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more." *Id.* at 854 (internal quotation omitted).

Here, the Board raises ten points of appeal, which fit into four broad groups. These are: 1) issues related to the 2004 ESY, including the Board's provision of extra services during the 2004-2005 school year; 2) the issues related to the April 3, 2006, IEP meeting; 3) EduCare or Larchmont as D.H.'s LRE; and 4) the other issues raised. After examining the issues before me, I determine the relief to which the Horens are entitled.

## I. Summer 2004 ESY

There are three sub-parts to the Horens' Summer 2004 ESY challenge: whether 1) the statute of limitations ran before they filed their due process complaint; 2) D.H. was entitled to ESY in 2004; and 3) the compensatory services provided during the 2004-2005 school year deprived D.H. of a FAPE.

### A. Statute of Limitations

The Horens filed their due process complaint on August 28, 2006. D.H.'s 2004 summer break ended on Monday, August 30, 2004. [Doc. 3, Ex. UU, at B00589]. Under the circumstances of this case, the SLRO held that any cause of action relating to the failure to provide ESY did not accrue until the entire period for providing ESY had passed. The Board contends that sometime before summer's end, the plaintiffs should have known that it was not going to provide ESY services to their daughter.

IDEA specifies: "[A] parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency *knew or should have known about the alleged action* that

13

forms the basis of the complaint." 20 U.S.C. § 1415(f)(3)(C) (emphasis added); *see also* Ohio Admin. Code 3301-51-05(K)(10)(e) (same).

The Board argues that this statute bars the Horens' 2004 ESY claim, because the Horens filed their due process complaint after the two-year period ran. It specifically seems to argue that the Horens knew of the Board's alleged failure when the Horens mailed the Board a letter on July 15, 2004, complaining "that they had not received ESY services during the summer, particularly the fulltime classroom services they had desired. A handwritten note from Mr. Horen on the letter indicates that it was re-sent on August 3, 2004." [Doc. 45, at 15 (internal citations omitted)]. If the Board is correct, the Horens' complaint on this issue is time-barred.

The Horens respond that their claim is not time-barred because they did not know of the Board's failure to provide ESY until the Board failed to provide services to D.H. "during the 2004-2005 school year as remediation for the confusion regarding summer 2004 services." [Doc. 32, at 12].

The SLRO held:

The issue raised by the Horens on appeal is that TPS failed to provide the 2004 ESY at all, not that there were concerns with the location or amount of services. There is no way that the Horens could have known in May of 2004 that TPS would fail to provide any ESY services whatsoever during June, July, and August 2004.  .   .   . The proper date for the statute of limitations under IDEA to begin tolling would be the end of the summer, after it became apparent that the 2004 services had not been provided.

[Doc. 1-19, at 17-18 (internal citations omitted)].

I find, despite the deferential standard of review, that the SLRO failed to acknowledge the requirement under § 1415(f)(3)(C) that a cause of action accrues *not just when a parent in fact knew of the* denial of rights under IDEA, *but when the parent should have known* of such denial.

14

Here, the Horens knew by mid-July at the earliest and early August at the latest, that the Board was neither providing ESY services nor was likely to do so. Even though the services were to be of short duration, silence on the Board's part about its intentions would communicate clearly to an attentive parent that it was not going to fulfill its obligations to provide the promised services. While the exact date of accrual may not be ascertainable, as a matter of law on the basis of the facts in this case, the statute ran sometime before August 28, 2006.

Though the parents may not have in fact known before summer's end (August 30, 2004) to a certainty that the Board would not provide ESY services, substantial grounds to apprehend that such services would not be forthcoming arose well before that date. The cause of action relating to Summer 2004 ESY was thus untimely.

## B. Summer 2004 ESY

The Horens claim that D.H. was entitled to ESY for Summer 2004 because "the IEP team itself determined [it] was necessary." [Doc. 47, at 2].

The Board responds that D.H. was not entitled to ESY, but that the Board "offered consultative services that it was not required to provide because DH was demonstrating an emerging skill." [Doc. 48, at 6].

The SLRO simply presumed that D.H. was entitled to ESY in 2004 because the Board offered D.H. compensatory services during Summer 2004. [Doc. 1-19, at 17-18].[6]

---

[6] The IHO, meanwhile, "addressed only the issues of 2005 and 2006 ESY, believing that the 2004 ESY issues had been resolved." [Doc. 1-19, at 15 n.9].

15

For the reasons that follow, I find that, even if the Horens' complaint were timely, their claim fails on its merits. The SLRO's decision to the contrary cannot stand, even in light of the highly deferential standard of review I must apply to her findings and conclusions.

### 1. D.H.'s 2004 IEP and Inclusion of ESY

In essence, the parties dispute how I should analyze this issue. The Horens – although they do not use this phrase – advocate that I adopt a "failure to include" approach, wherein I assess whether the Board's failure to provide D.H. with the ESY provided in her IEP harmed her. *See, e.g.*, *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 348-49 (5th Cir. 2000); *S.S.* ex rel. *Shank v. Howard Road Acad.*, 585 F. Supp. 2d 56, 68 (D.D.C. 2008).

The Board, meanwhile, argues that the Horens have the burden of demonstrating that the Board should have included ESY in D.H.'s IEP. *Cordrey v. Eukert*, 917 F.2d 1460, 1473 (6th Cir. 1990).

Neither party focuses on the preliminary question of whether D.H.'s 2004 IEP included ESY, the answer to which dictates the analysis I perform.

Examination of D.H.'s 2004 IEP – created December 1, 2003 – leads me to conclude that it did *not* include ESY.

The key document [Doc. 3, Ex. Z, at B00492] consists of two tables. At the top, the document is titled "Individualized Education Program (IEP)." Just below that, there is a table titled "Special Factors." Below that is a second table titled "Other Considerations."

Above the "Special Factors" table – the uppermost of the two – is the sentence: "Based on discussions of the information provided regarding relevant special factors and other considerations as noted below, the following is applicable and incorporated into the IEP." The "Special Factors"

16

table includes a list of various items on the left such as "Behavior," "Limited English proficiency," and so on. On the right hand side of that table – indeed, both tables – is a series of checkmark boxes parallel to the various items listed on the left. Above that line of boxes – and *inside the "Special Factors" table* – is the heading "Incorporated into IEP (Check box)."

Below the "Special Factors" table, meanwhile, lies the smaller "Other Considerations" table. Inside that box is another list of various items, including – listed second – "Extended school year services." The box next to "Extended school year services" is checked. The box next to the first "Other Considerations" factor – "Physical education" – is also checked, but handwritten next to that is "adapted."

The Horens argue the checkmark next to "Extended school year services" means the IEP included ESY services. The Board responds that the checkmark signifies that the team merely considered provision of such services. The Board argues that the sentence above the "Special Factors" table and the fact that the "Incorporated into IEP (Check box)" is *inside* the "Special Factors" table demonstrate that checking the box for "Special Factors" meant they were included in the IEP. Meanwhile, the Board argues that "[i]tems checked in the section 'Other Considerations' were considered, but *not* necessarily incorporated into the IEP." [Doc. 48, at 9-10].

The Board further points out: "Notably, on the signature page of Doc. 3, Ex. Z, at B00490, where the special education services to be provided under the IEP are summarized, there is no mention of ESY." [Doc. 48, at 9-10].

The Board's argument is well taken. Besides its convincing textual analysis of Doc. 3, Ex. Z, at B00492, the Board also points to the "Summary of special education services" on Doc. 3, Ex.

17

Z, at B00490. That summary includes all the "Special Factors" checked – various "Communication"

and "Assistive technology services and devices" – in addition to "Adapted P.E. Aide services[.]"

In this summary, the IEP team's *inclusion* of the adapted physical education services, another

"Other Consideration" but *exclusion* of "Extended school year services" lends further credence to

the Board's interpretation.[7]

Because I conclude the 2004 IEP did not include ESY, the Horens must establish D.H.'s

entitlement to ESY under the *Cordrey* test.

### 2. D.H.'s Entitlement to Summer 2004 ESY

The Horens have the burden of showing D.H.'s entitlement to ESY. *Kenton County Sch.*

*Dist. v. Hunt*, 384 F.3d 269, 278-79 (6th Cir. 2004); *Cordrey*, *supra*, 917 F.2d at 1473.

---

[7] The Horens point to several other documents suggesting that D.H.'s 2004 IEP contemplated ESY. [Doc. 3, Ex. 18, at B00563, B00564].

The first is a "Toledo Public Schools Extended School Year I.E.P. Team Summary" and states: "The I.E.P. team met on 5-14-04 and decided: To provide Extend School year services." [*Id.* at B00563]. The form, however, is only signed by Fuelling – who checked "Agree" – and Joanne Horen – who checked "Disagree" and wrote "not invited/noticed" next to her signature. [*Id.*].

The second is a copy of a letter stating "Due to the fact that [D.H.] never received her promised E.S.Y. Services, she is entitled to compensatory hours." [*Id.* at B00564]. Fuelling, Dykyj and LeBlanc signed the form.

A third form – Doc. 3, Ex. 18, with no page number – is a letter from a Charlotte Cosart, a "Case Manager" for Toledo Public Schools, to the Horens. It reads, in relevant part: "I have been informed that following an IEP meeting at Educare this spring it was decided that [D.H.] is a candidate for extended school year service." [Doc. 3, Ex. 18].

While these documents suggest that at some point someone decided D.H. merited ESY, no official IEP team concluded as much – for example, the forms above notably lack Reuss and Joanne Horen's signatures. These documents are thus unable to override the IEP forms [Doc. 3, Ex. Z, at B00490, B00492] that I interpret to demonstrate *consideration*, but no award, of ESY.

This is especially so given the Sixth Circuit's emphasis that ESY is justified only to ensure a student receives a FAPE based on a proper IEP. *L.M.*, *supra*, 478 F.3d at 315.

IDEA requires schools to provide ESY where necessary to provide a child with a FAPE. 34

C.F.R. § 300.106(a); *see also* Ohio Admin. Code 3301-51-02(G).

The court in *Cordrey* articulated the standard in this circuit for showing entitlement to ESY:

> We therefore begin with the proposition that providing an ESY is the exception and
> not the rule under the regulatory scheme. Given these policy considerations,
> therefore, it is incumbent upon those proposing an ESY for inclusion in the child's
> IEP to demonstrate, in a particularized manner relating to the individual child, that
> an ESY is necessary to avoid something more than adequately recoupable regression.

917 F.2d at 1473; *see also* Ohio Admin. Code 3301-51-02(G)(1)(b).

This showing of regression, moreover, must be proven by "empirical data" or "expert

opinion, based upon a professional individual assessment." *Cordrey*, *supra*, 917 F.2d at 1472.

The court in *L.M.* characterized the *Cordrey* test as "an even stricter test" than the one

conceived of by IDEA's regulations – 34 C.F.R. § 300.106(a) – and cited above. 478 F.3d at 315.

It clarified the test as requiring "demonstrat[ion], in a particularized manner relating to the

individual child, that an ESY is necessary to avoid regression so severe that the child would not be

able to catch up during the following school year." *Id.* "Necessary" signifies that its absence

deprived the student of a FAPE for that year. *Id.*; *see also Cordrey*, *supra*, 917 F.2d at 1473-74.

To challenge successfully any action or inaction regarding ESY, therefore, the party seeking

inclusion of the ESY must show that the failure to provide ESY sought deprived the student of a

FAPE for that year. *Cordrey*, *supra*, 917 F.2d at 1473-74; *see also L.M.*, *supra*, 478 F.3d at 315 ("If

the child benefits meaningfully within his potential from instruction under a proper IEP over a

regular school year, then ESY may not be required under the Act unless the benefits accrued to the

child during the regular school year will be significantly jeopardized if he is not provided an ESY.").

The court in *L.M.* held that the guardian of a disabled student had a duty to make such a showing

19

even where the student received some summer services – though the guardian claimed they were inadequate. 478 F.3d at 315.

Such a showing is not easily accomplished. In *Hunt*, *supra*, 384 F.3d at 280, for example, the parents of a disabled student argued that their son should have received ESY services, and sought reimbursement for sending him to a summer program. Rejecting the parents' argument, the Sixth Circuit held inadequate the general testimony of three doctors on the likelihood of a student's regression over the summer. *Id.*

Having pointed to no empirical data or expert opinions demonstrating D.H.'s regression, the Horens cannot show D.H. was entitled to ESY for Summer 2004. In fact, the Horens do not attempt to do so. They merely state:

> The Board asserts in its motion that the Horens "could have established the need for ESY through the use of expert testimony, but  .  .  .  they did not." Again, it was unnecessary. The alleged *experts* that worked for the Board, the occupational therapist (OT), physical therapist (PT), and [D.H.]'s teacher, all signed the IEP determining that ESY was necessary as a "Special Factor" in her educational plan. They didn't provide *what the IEP team itself* determined was necessary.

[Doc. 47, at 9].

As I found above, the evidence adduced does not show the IEP team found 2004 ESY necessary. Because the Horens present no other evidence, their claim here fails.[8]

---

[8] The Horens do not otherwise raise arguments in the instant case that the 2004 IEP was procedurally or substantively deficient.

20

D.H. was thus not entitled to Summer 2004 ESY under her 2004 IEP. The Board's decision to offer her gratuitous services beyond her IEP[9] and then failure to provide such services during Summer 2004 merits no compensation. *L.M.*, *supra*, 478 F.3d at 315.

## C. Provision of Additional Services During 2004-2005

Having found that D.H. was not entitled to Summer 2004 ESY, I must still determine whether the compensatory services the Board provided during her 2004-2005 school year (to make up for the gratuitous services the Board failed to provide during Summer 2004) denied her a FAPE by taking time away from her IEP education.

The Board acknowledges that it gratuitously promised D.H. four hours of consultation services during Summer 2004, which it never provided. In compensation for those hours, Fuelling, LeBlanc and Dykyj determined that D.H. "now qualifies for 5 hours of additional occupational therapy and an extra 5 hours of physical therapy provided by her current therapists at T.P.S. A schedule will be developed for these additional times during her school day[.]" [Doc. 3, Ex. 18, at

---

[9] The Board notes:

> [B]ecause DH had an emerging skill, the Board decided to offer consultation services to see if the skill could continue to grow. (T. 1779). The Board decided to make available 4 hours of services in the form of consultation to DH's summer daycare provider regarding DH's occupation therapy (OT) and physical therapy (PT) so that the daycare provider could maintain DH's routine. But the Horens did not notify the Board where DH would attend daycare during the summer of 2004. [DH thus never received the services.]

[Doc. 45, at 17]; *see also* Part I.B.1, n.7, *supra*.

Because D.H. had no entitlement to these gratuitous services, the Horens can claim no harm from the Board's failure to provide them. *Cf. Bobby R.*, *supra*, 200 F.3d at 348-49; *Shank*, *supra*, 585 F. Supp. 2d at 68.

B0564]. LeBlanc and Dykyj provided these hours – at total of 10.25 hours – over the course of the

2004-2005 school year. [Doc. 3, Ex. HH, at B00957-58].

The Horens, meanwhile, argue: "If it was found that such services were actually provided

[during 2004-2005], which they weren't as evidenced by the daily care sheets, they would have been

provided during the regular school day taking additional time away from [D.H.]'s education." [Doc.

47, at 4].

The IHO described his understanding of the situation:

In November 2004 the IEP team met. Because of the apparent summer [2004]
miscommunication, the district offered to provide the student five hours each of
direct OT and PT services during school to compensate for the two hours each OT
and PT consulting services missed during summer 2004. District personnel testified
to their understanding from that meeting that the [Horens] were satisfied with that
compensation. The compensatory services were documented to have been provided
during the 2004-2005 school year. (Ex. HH).

[Doc. 1-15, at 49].

The IHO then inappositely concluded: "The [Horens] have failed to demonstrate the

student's eligibility for ESY in 2005 or 2006 under the regression standard. Thus, they have failed

to prove any substantive harm that would warrant a determination that she had been denied a

FAPE." [*Id.*].

The SLRO, meanwhile, found:

While the Horens may have been satisfied with the services themselves, they were
not satisfied that the compensatory services were being offered during [D.H.]'s
regular school day, when she was supposed to have been receiving the services
regularly provided under her IEP. Taking [D.H.] from her regular IEP work to
provide missed services amounts to an overall reduction of instructional time, which
is clearly not in [D.H.]'s best interests. Further, reducing the time spent working on
D.H.'s IEP activities is a denial of FAPE, and compensatory education is the
appropriate remedy in this case.

[Doc. 1-19, at 18 (internal citation omitted)].

In determining the compensation required, the SLRO then held: "[D]ue to both the denial of FAPE and the protracted proceedings in this matter, in consideration of the lost educational services for [D.H.], she should be provided with six months of compensatory education, rather than just a summer." [*Id.* at 42].

Even according the SLRO's opinion "due weight," her finding is in error.

First, the Horens – who have the burden of proof here – argue that the Board never provided D.H. with these services, which would mean the Board did not substitute any compensatory services for D.H.'s classwork. Second, even assuming the Board provided these services, the Board presents evidence – in the form of LeBlanc [Doc. 1-10, at 720-24; Doc. 1-11, at 25-28] and Dykyj's [Doc. 1-11, at 224-25, 241-43] testimony – that the therapists provided these compensatory services during "down time" [Doc. 1-10, at 721-22] or other time "so as not to interfere with the other activities that [D.H.] engages in" [Doc. 1-11, at 242-43]. The Horens, meanwhile, present no contrary evidence, nor is there any evidence in the record to the contrary on which the SLRO could base her determination.

I therefore find that the Board's provision of compensatory services – if any – did not interfere with or take away from D.H.'s 2004-2005 normal IEP activities and goals, and thus that no denial of a FAPE resulted. *Deal*, *supra*, 392 F.3d at 854.

The SLRO thus should not have awarded the Horens any compensatory education on this issue, let alone six months' worth for the alleged improper provision of ten hours of gratuitous services during the school day. 20 U.S.C. § 1415(i)(2)(C); *see also Pohorecki v. Anthony Wayne Local Sch. Dist.*, 637 F. Supp. 2d 547, 560-61 (N.D. Ohio 2009).

23

## II. The April 3, 2006, IEP Meeting

The Board also contests several aspects of the SLRO's opinion regarding the April 3, 2006, IEP meeting: whether 1) the Board appealed the IHO's findings regarding the IEP meeting; 2) the IEP meeting was procedurally invalid for insufficient parental involvement; 3) if so, the procedural violation denied D.H. a FAPE; and 4) D.H. is entitled to any relief for the purported procedural violation.

### A. Scope of the Board's Appeal

The SLRO found that the Board did not appeal the IHO's findings regarding the April 3, 2006, meeting. [Doc. 1-19, at 2 n.1 ("The April 3, 2006 IEP team meeting has not been brought as an issue on appeal by either party."); 4 ("[T]he IHO Decision that TP's procedural violation substantially denying the parental participation in the August 3, 2007 IEP meeting resulted in violating [D.H.] a substantive right of FAPE in the development of the 2005-2006 school-year IEP is AFFIRMED as uncontested.");[10] 24 n.11 ("TPS did not challenge the IHO's finding on [the April 3, 2006, meeting] in their assignments of error, indicating they are satisfied with the IHO's finding that TPS violated the IDEA."); 42 ("The IHO's decision that TPS' denial of parental participation in the April 3, 2006 IEP meeting amounted to a violation of FAPE was not challenged in this appeal, and, thus, that decision stands.").

The Board protests that it appealed the "IHO's determination that the Board[: 1)] committed a procedural violation in connection with an IEP meeting on April 3, 2006"; and 2) "violated a

_____

[10] Because there was no "August 3, 2007," meeting, I assume that the SLRO meant the IEP meeting on *April* 3, *2006*. Also, the SLRO's identification of the school year in question – "2004-2005" – was incorrect. It should be 2006-2007.

substantive right of a FAPE in connection with the April 3, 2006 IEP meeting." [Doc. 1, at 6 ¶¶ 26-27]. The Board explains:

> [I]t was the IHO's twice-stated determination that a substantive procedural violation, *i.e.*, a denial of FAPE, had occurred because his interpretation was that the legal requirement was for the Board to *ensure* parent participation. . . . Thus, the Board did appeal to the SLRO from the IHO's finding that denial of FAPE had occurred in connection with the April 3rd meeting.

[Doc. 45, at 10-11].

The Horens disagree and summarily urge me to affirm the SLRO's findings that the Board did not appeal the IHO's determinations regarding the April 3, 2006, IEP meeting: "Clearly, the appeal notice states nothing in relation to finding the IHO decision in regard to the failure to provide FAPE based on the April 3, 2006 meeting, was erroneous. The SLRO was correct. *TPS did not appeal the decision on the basis of FAPE*." [Doc. 32, at 7 (emphasis added)].

The Board's notice of appeal to the SLRO states, in relevant part:

> TPS appeals the IHO's "statement§ of law" to the effect that a school district has an obligation to ensure the participation of parents at an IEP meeting. Examples include the IHO's statements, but are not limited to, Decision page 35 ("Its [Congress's] admonition for the school district is to ensure the participation of Parents."), and, Decision page 41 ("It is the obligation to ensure participation by scheduling a meeting a mutually agreed upon time and place or if neither parent can attend, to ensure parent participation through other methods which is lacking for the April 3rd meeting."). TPS asserts that the IHO statements are inconsistent with applicable laws and regulations, including but not limited to OAC 3301-51-07(F).

[Doc. 1-16, at 1].

I agree with the Board. IDEA states that "any party aggrieved by the findings and decision rendered in [an IHO] hearing may appeal such findings and decision to the State education agency." 20 U.S.C. § 1415(g). Ohio law explains further: "The notice [of appeal] shall set forth the order appealed and the grounds of the party's appeal." Ohio Admin. Code 3301-51-05(K)(14)(b)(i)(*a*).

While no cases explain the specificity required of this exact Ohio Administrative Code provision, the Ohio Supreme Court has recently interpreted identical "grounds of the party's appeal" language in another administrative context and held that reciting the standard of review is inadequate. *Medcorp, Inc. v. Ohio Dep't of Job & Family Servs.*, 121 Ohio St. 3d 622, 626-27 (2009). In that case, the court explained:

> [W]e hold that to satisfy the 'grounds of the party's appeal' requirement in [O.]R.C. 119.12, parties appealing under state statute must identify specific legal or factual errors in their notices of appeal; they may not simply restate the standard of review. *While an extensive explanation of the alleged errors is not required at that point in the proceedings, the stated grounds must be specific enough that the trial court and opposing party can identify the objections and proceed accordingly*, much in the same way that assignments of error and issues for review are presented in the courts of appeals and propositions of law are asserted in this court.

*Id.* (emphasis added).

Here, the Board certainly presented more than merely the standard of review. It pointed to the April 3, 2006, IEP meeting – as evidenced by the example quotations cited in its notice of appeal – and argued that requiring parental presence at that meeting was in error. Its failure to specifically identify that error as a procedural one or to tie that violation to a denial of a FAPE do not waive those issues, because "an extensive explanation of the alleged errors is not required at that point in the proceedings." *Id.* The Board's language was adequate to "identify [the] specific legal or factual errors" regarding the April 3, 2006, IEP meeting, *id.*, and the SLRO's determination to the contrary was erroneous.

I thus find that the Board adequately appealed all issues regarding the April 3, 2006, IEP meeting and reach the merits of the Board's claims on this issue.[11]

---

[11] I find no need to remand to SLRO for consideration of this issue for two reasons. First, the record before me is exhaustive on this point and adequate for my consideration of the issue. Second,

26

### B. Adequate Parental Involvement

The Horens argue that the April 3, 2006, IEP meeting was procedurally invalid because of their absence therefrom. They assert that they did not receive the invitation, [Doc. 32, at 8 ("[T]he Horens did not receive [the IEP meeting invitation].")], but also seem to suggest that they simply did not have time to prepare for the meeting [*Id.* at n.4 ("If the regular mail services is to be followed, that would mean the Horens received the invitation at the earliest, on Thursday - March 30, just 4 days before the meeting was to occur. No[t] only would such a time frame not provide enough notice for the Horens under the law, it is inconsistent with them being able to obtain [D.H.]'s educational records for review for them to be able to participate.")].

The Board, meanwhile, contends that the meeting was procedurally valid because the Horens knew of it, but chose neither to attend nor to reschedule. The Board notes: "It was not unusual for the Horens to be unresponsive to contacts requesting convenient dates for meetings, or even written invitations to IEP meetings." [Doc. 45, at 9]. The Board further argues that "[t]he Horens could have scheduled a further meeting as they sought in their January 2006 letter . . . or they could have sent written suggestions for the April 3rd IEP meeting, as they also did in January. The Board submits that it gave them the opportunities to participate." [*Id.* at 12].

---

the IHO assessed the issue, so I have at least one level of state administrative review to draw on for my analysis. *E.g.*, *Maynard* ex rel. *G.M. v. District of Columbia*, — F. Supp. 2d ----, 2010 WL 1292866, *6 & n.6 (D.D.C.) (finding remand to state hearing officer when record and findings adequate for district court's review); *Stanton* ex rel. *K.T. v. District of Columbia*, 680 F. Supp. 2d 201, 205 (D.D.C. 2010) ("Where the administrative record lacks pertinent findings and where neither party requested consideration of additional evidence, the [court] may determine that the appropriate relief is a remand to the hearing officer for further proceedings." (internal quotations and citations omitted)).

IDEA regulations require that "[e]ach public agency must take steps to ensure that one or both of the parents of a child with disability are present at each IEP Team meeting or are afforded the opportunity to participate[.]" 34 C.F.R. § 300.322(a); *see also* 20 U.S.C. § 1414(d)(1)(B)(i) (defining an IEP team to include the child's parents). However, "[i]f neither parent can attend an IEP Team meeting, the public agency must use other methods to ensure parent participation, including individual or conference telephone calls[.]" 34 C.F.R. § 300.322(c). The regulations, nevertheless, also provide:

> Conducting an IEP Team meeting without a parent in attendance. A meeting may be conducted without a parent in attendance if the public agency is unable to convince the parents that they should attend. In this case, the public agency must keep a record of its attempts to arrange a mutually agreed on time and place, such as -- (1) Detailed records of telephone calls made or attempted and the results of those calls; (2) Copies of correspondence sent to the parents and any responses received; and (3) Detailed records of visits made to the parent's home or place of employment and the results of those visits.

*Id.* § 300.322(d).

The Sixth Circuit has recognized that "the regulations expressly provide for the development of an IEP without parental involvement." *Knable*, *supra*, 238 F.3d at 765. Discussing this issue, the Ninth Circuit has held that parental refusal to meet allows a school district to hold an IEP without the parents, but that a request to reschedule does not constitute refusal to meet. *Shapiro* ex rel. *Shapiro v. Paradise Valley Unified Sch. Dist. No. 69*, 317 F.3d 1072, 1078 (9th Cir. 2003), *superseded by statute on other grounds by* 20 U.S.C. §§ 1414(d)(1)(B)(ii)-(iii); *Drobnicki* ex rel. *Drobnicki v. Poway Unified Sch. Dist.*, 358 F. App'x 788, 790 (9th Cir. 2009) (unpublished disposition); *see also Mr. "M"* ex rel. *"K.M." v. Ridgefield Bd. of Educ.*, 2007 WL 987483, *5-7 (D. Conn.) (holding that a district's failure to respond to a parent's telephonic request to change an

28

IEP date, notwithstanding the parents' failure to respond to a subsequent email, violated IDEA's parental involvement regulation).

In *Shapiro*, the school district held an IEP meeting without the parents because it believed the parents' opportunity – but failure – to attend the meeting allowed the district to proceed without them. 317 F.3d at 1078. The district further argued that it mailed them the IEP later and allowed them to comment. *Id.*

> The Ninth Circuit held that the school district's actions violated IDEA:
>
> After-the-fact parental involvement is not enough [to satisfy IDEA's IEP parental involvement command]. Nor does the [district]'s inclusion of the [parents] in certain parts of the process excuse the district's failure to include the [parents] in the June 8 IEP meeting; *involvement in the [IEP] 'creation process' requires the [district] to include the [parents] unless they affirmatively refused to attend.*

*Id.* (emphasis added).

On the other hand, Congress, *see* 34 C.F.R. § 300.322(d), and courts have recognized the practical difficulties of coordinating IEP meetings with obstinate or unresponsive parents. *See, e.g.*, *Winkelman v. Parma City Sch. Dist. Bd. of Educ.*, 2009 WL 4456297, *15-16 (N.D. Ohio) (finding no procedural violation for the failure to have parents at an IEP meeting where the district "twice communicated with [the parents] in some fashion before the start of school offering to meet with them about an IEP for [the student] and those communications generated no response"); *E.P. v. San Ramon Valley Unified Sch. Dist.*, 2007 WL 1795747, *7-11 (N.D. Cal.) (finding no procedural violation for the failure to have parents at an IEP meeting where the district "made a good faith effort to schedule a 'mutually agreed on time and place' for the final IEP meeting," and the parents were obstinate and did not demonstrate an "absolutely inability to attend the IEP"); *Mr. G. v. Timberlane Reg'l Sch. Dist.*, 2007 WL 54819, *11 (D.N.H.) ("[A]fter agreeing to the terms of the

IEP, plaintiffs time and again neglected to attend team meetings of which they were informed and to which they were invited. When they did attend meetings, Ms. K. often made sweeping and unqualified declarations of what she felt EG needed and refused to engage in a dialogue with the District regarding EG's education. Instead, she withdrew from the meetings and threatened immediate appeal to a Due Process hearing. I conclude that the District made all reasonable efforts to secure [the parents]' participation and reasonably proceeded without them[.]").

Here, the evidentiary record is mixed. Like the parents in *Timberlane*, the Horens sometimes failed to respond to the Board's attempts to schedule IEP meetings, and even to attend meetings. [Doc. 1-10, at 150-52, 352-62; Doc. 3, Exs. X, at B00462-65; Y, at B00476-77; AA, at B00941].

Specifically, in the lead up to the April 3, 2006, IEP meeting, TPS sent the Horens a letter indicating that the next IEP would be in March and seeking a convenient date. [Doc. 3, Ex. W, at B01141-42, B01153-54].

On March 27, 2006, the Board sent a written invitation to the April 3, 2006, meeting, which stated: "If you would like to schedule the conference at a different time, date, or location . . . please contact Kellie Fuelling," and included her phone number. [Doc. 3, Ex. V, at B00446]. The Board submits evidence that the Horens called to cancel the IEP meeting, and indicated that they only desired to meet with Felt on April 3, 2006. [Doc. 1-13, at 20-21, 111, 470-72; Doc. 3, Ex. V, at B00447-48].[12] They appeared to suggest they would reschedule the IEP meeting at a better time for them, but they never did so. [Doc. 1-13, at 20-21; Doc. 3, Ex. V, at B00447-48].

---

[12] At the February 28, 2006, meeting, the Horens had expressed a desire to sit down with Felt before attending any further IEP meetings.

30

Instead, the Horens met with Felt and Reuss in the morning of April 3, 2006. [Doc. 1-10, at 241; 1-13, at 472-3]. Reuss left early, and said nothing to the Horens regarding the IEP meeting to be held later. [Doc. 1-10, at 254; Doc. 1-13, at 473-75]. Reuss explains that she said nothing to the Horens because, "when I left the [] meeting [with Felt], I didn't know if [the Horens] would then meet with the IEP team because I had left the building." [Doc. 1-13, at 475]. Reuss states her silence stemmed from a belief that one meeting – the meeting with the Horens and Felt – would transition into the IEP meeting later in the day: "My understanding is I was there for the [Horens-Felt] meeting, I had no idea how long it would take, then we would go into an IEP meeting." [*Id.* at 478].[13]

Regardless of misunderstandings, there is no evidence that any member of the IEP team that met on April 3, 2006, informed the Horens that the meeting was still taking place that day, in the school where the Horens met with Felt and Reuss. [*Id.* at 476-82; *see also id.* at 487 ("[Board's

---

[13] The following exchange sheds further light on Reuss's understanding:

[Joanne Horen:] Where would we meet for the [April 3, 2006] IEP meeting?
[Reuss:] In the room you were in for the IEP/MFE meeting [with Felt]. The [IEP] team would come down to you.
[Joanne Horen:] Did you meet with the IEP team?
[Reuss:] Yes, but in that room they said you had left.
[Joanne Horen:] What time was that?
[Reuss:] I don't know, sometime.
[Joanne Horen:] So you came down to have an IEP meeting sometime after 10:00 and looked for the Horens; is that what you testified?
[Reuss:] Came back to EduCare after my other meeting outside of the building.
[Joanne Horen:] So the IEP team was meeting in a room that we had previously met with Doug [Felt]; is that what you're saying?
[Reuss:] No, I believe I went down to the classroom and they said you did not stay.
[Joanne Horen:] Did they indicate to you that we had talked to them at all about if we missed an IEP meeting?
[Reuss:] No.

[Doc. 1-13, at 475-76].

31

counsel]: So do you – you have no knowledge whether any member of the IEP team besides yourself told the Horens that there was going to be an IEP meeting? [Reuss]: No, I don't know, that's right, I have no knowledge.")].

Fuelling explained why the IEP meeting continued notwithstanding the Horens' attempt to cancel it:

> Because like we – it wasn't like a huge sit down meeting. We already had all of our preplanning meetings, we all submitted what goals and objectives we wanted to work on, so when [the Horens] canceled, we said does everybody's IEP still stand, do we want any changes in this, [and] we all agreed that that was fine but then we were going to hold it [open] for you to come in and discuss it in case we needed to make any changes after that.

[Doc. 1-13, at 111].

The IHO described what he saw to be the point of confusion between the parties on this issue:

> Both parties during their testimony used the word "cancel" to describe the language [the Horens] used in person to person meetings or phone calls in reference to the MFE conference and/or the IEP meeting scheduled for April 3, 2006. The word "canceled" is also written in various notations recording contacts made and results of the contacts again pertaining to these two meetings. Apparently, [the Horens'] use of the word "cancel" meant that the [Horens] were canceling a particular meeting that they received an invitation to attend, expecting that the meeting would be scheduled later. On the other hand, the school district's apparent understanding meant that [the Horens] were not going to attend the meeting and that a second meeting would be scheduled for the parents['] participation. Mrs. Reuss testified to the fact that she has 600 students in her district that fall under [IDEA]. For scheduling purposes, it is therefore understandable that the school district would proceed with the scheduled meetings unless another time and location was mutually agreed upon in a timely manner. Any proposed rescheduling on the part of the [Horens] not timely communicated before the first scheduled date would not forestall the school district in having the meeting. A seeming innocent word appears to have been the cause of a lot of confusion, frustration and apprehension on the part of both parties.

[Doc. 1-15, at 40-41].

Relying on his flawed belief that the school district had to ensure *actual* parent participation as opposed to the *opportunity* for parent participation, [Doc. 1-19, at 39-40 (the SLRO's finding that the IHO erred on this point)], however, the IHO ultimately concluded:

> Notices sent out to the [Horens] for the April 3rd meeting sufficiently notified [the Horens] of the meeting.
>
> . . . .
>
> Regarding the meeting of April 3rd, the form of notification was present but the acceptance of the team to the wishes of the [Horens] was not. There was no attempt on the part of the school district to seek rescheduling of the date as before. There was no attempt of communication of the date of the meeting when the [Horens] were in the building and as decided in the first issue above, the [Horens] were not put on notice of the change of placement. Notification is more than mere form. It is the obligation to ensure participation by scheduling a meeting a mutually agreed upon time and place or if neither parent can attend, to ensure parent participation through other methods which is lacking for the April 3rd meeting.

[Doc. 1-15, at 40-41].

While the IHO's interpretation of the law was flawed, I find well taken – and assign "due weight" to – his point that the other members of the IEP team – in particular, Reuss – could have done more to see if the Horens could attend the IEP meeting, notwithstanding any prior indications to the contrary. This is especially so because the IEP meeting took place later the *same day* in the *same building* as the Horens' meeting with Felt and Reuss.

Drawing on the language and reasoning of *Shapiro*, I thus find that – even viewing the facts in the light most favorable to the Board – it did not do enough to attempt to include the Horens at the April 3, 2006, IEP meeting to satisfy its obligation under 34 C.F.R. § 300.322. Against the background of confusion and the parents' attempts to either cancel or reschedule, I find the Board should have attempted to accommodate the parents by rescheduling, or at least discussed the continued existence of the meeting when the parents were *in the same school on the same day near the same time*.

33

Most simply put: the Horens had asked for a postponement. They had received no definitive response to that request. In that circumstance, the Board at the very least should have either rejected the request in a timely manner or confirmed with the Horens the morning that it planned to proceed with the IEP meeting as scheduled later in the day. The Board thus violated the procedures set forth in IDEA. *Deal*, *supra*, 392 F.3d at 853.

### C. Denial of a FAPE

Finding that the Board committed a procedural violation, however, does not end my inquiry. Given the Board's procedural violation, there remains the issue of whether that violation was harmless, or whether it denied D.H. a FAPE. *Id.* The Sixth Circuit has stated:

> [A] procedural violation of the IDEA is not a *per se* denial of a FAPE; rather, a school district's failure to comply with the procedural requirements causes *substantive harm* to the child or his parents. *Substantive harm occurs when the procedural violations in question seriously infringe upon the parents' opportunity to participate in the IEP process.* In addition, procedural violations that deprive an eligible student of an [IEP] or result in the loss of educational opportunity also will constitute a denial of a FAPE under the IDEA.

*Knable*, *supra*, 238 F.3d at 765-66 (emphasis added) (internal citations omitted).

The court in *Knable* then held that failure to convene an appropriate IEP conference with effective parental participation may cause such "substantive harm." *Id.* at 766.

Inadequate parental involvement, as at issue here, is the *heart* of "serious[] infringe[ment] upon the parents' opportunity to participate in the IEP process." *Id.* at 765. While the Board adequately involved the Horens in drafting the January, 2006, IEP, [Doc. 1-19, at 27-29], and then held an additional meeting on February 28, 2006, [Doc. 1-15, at 17-18], the Board did not

34

adequately involve the parents in the April 3, 2006, IEP meeting, at which the Board changed D.H.'s placement from EduCare to Larchmont.[14]

This change of placement is particularly significant because Larchmont is less restrictive than EduCare and lacks the same medical staff as EduCare. *See* Part III, *infra*. As the IHO noted, "[s]hould [the Horens] have been put on notice that the school district was contemplating a change in placement at the April 3rd IEP meeting, the [Horens] would have had the opportunity to request an [independent educational evaluation and] . . . to supplement her [medical] file." [Doc. 1-15, at 35]. D.H.'s "medical record at the time the educational staff made its [change of placement] decision was incomplete." [*Id.*].

D.H. thus suffered "substantive harm" from – and was denied a FAPE by – the Board's failure to involve her parents adequately in the April 3, 2006, IEP because it changed her placement without adequate input from the Horens.[15]

---

[14] This is especially so because IDEA requires "that parents be provided prior written notice whenever the school district proposes . . . to initiate or change the educational placement of the child." *Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 525 (6th Cir. 2003) (citing 20 U.S.C. § 1415(b)(3); 34 C.F.R. § 300.503).

Moreover, as the IHO noted, Ohio law likewise requires parental notice regarding impending changes of placement: "Informed parental consent must be obtained before making a change of placement of a child with a disability." Ohio Admin. Code 3301-51-05(E)(5)(b). This requirement, however, contains an exception for when the school district demonstrates "reasonable efforts . . . . to obtain consent, and the child's parent has failed to respond." *Id.* 3301-51-05(E)(5)(c)(i).

This exception does not apply here because there is no evidence that the Board mentioned that the change of placement would take place at the April 3, 2006, IEP meeting.

[15] I, however, decline to rest my decision in this regard on any discussion of predetermination, unlike the IHO. [Doc. 1-15, at 33-36].

"Predetermination" is "pre-select[ion of] a particular program for [a student before creating his or her IEP,] regardless of [his or her] demonstrated individual needs." *Nack*, *supra*, 454 F.3d at 610 (citing *Deal*, *supra*, 392 F.3d at 855).

The Horens have not demonstrated adequate evidence of predetermination. IEP members' *discussions* prior to an IEP meeting regarding a possible change in placement [Doc. 1-13, at 493-512] are entirely proper, so long as no "final determination [is] made prior to the IEP Team

35

I postpone until Part V, *infra*, however, my discussion of what relief is due D.H. from this denial of a FAPE.

### III. LRE

I next address the substantive question of whether the Board properly determined that the LRE in which to educate D.H. was Larchmont, not EduCare.

The Horens seem to suggest that neither EduCare, see Doc. 32, at 3 ("Both the Horens and the Board felt EduCare was inappropriate for [DH]."), nor Larchmont, see *id.* at 4 ("The Horens, both the IHO and SLRO, (and [D.H.]'s physician) found *Larchmont* to be inappropriate for her."), was the LRE for D.H.[16] They, nonetheless, adequately argue that – as the IHO and SLRO found – EduCare, not Larchmont, was the LRE for D.H. [*Id.*, at 4-6].

The Board responds that Larchmont, not EduCare, was the LRE, because the staff at Larchmont can adequately address D.H.'s needs while educating her amidst non-disabled students.

_____

meeting." *N.L. v. Knox County Schs.*, 315 F.3d 688, 691 (6th Cir. 2003); *see also id.* at 694 ("The [IDEA] regulation[s] prohibit[] a completed IEP from being presented at the IEP Team meeting or being otherwise forced on the parents, but state[] that school evaluators may prepare reports and come with pre-formed opinions regarding the best course of action for the child as long as they are willing to listen to the parents and the parents have the opportunity to make objections and suggestions.").

This is especially so where – as here – the change of location is spurred at least in part by the parents' complaints regarding the *current placement*. [Docs. 1-10, at 229-32; 1-14, at 119-25].

[16] Some of the parties' confusion on this issue likely stems from the fact that the SLRO was inconsistent in her language. She stated at different points that the LRE was EduCare, Doc. 1-19, at 3 ("[T]he IHO was correct in his determination that the [LRE] for [DH] was the Educare program[.]"), 40 ("The IHO found that the LRE for [DH] would be the Educare Center. . . . The decision of the IHO is correct."), and Larchmont, *id.* at 41 ("[T]he IHO was correct in finding that Larchmont was the LRE.").

Examination of the IHO's decision, however, reveals that the IHO found solely EduCare to be the LRE. [Doc. 1-15, at 38 ("[T]he [LRE] for the student is Educare.")]. The SLRO's statement regarding Larchmont being the LRE was thus likely just a typographical error.

During 2006, D.H.'s teachers and administrators discussed a change of placement for D.H. from EduCare to Larchmont. [Doc. 1-13, at 493-512]. In D.H.'s April 3, 2006, IEP meeting, the team concluded that a change of location to Larchmont was proper: D.H.'s LRE is a "[s]pecial class learning center [EduCare] in a separate facility where a small class size and limited distractions provide the opportunity for intensive, direct instruction and guided practice, until June 2, 2006; effective Aug. 30, 2006 [however, D.H.'s LRE is] a special class learning center in a school building [Larchmont]." [Doc. 3, Ex. V, at B00439].

IDEA requires that a school district educate a disabled student in the LRE appropriate given the student's needs:

> To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A).

The Sixth Circuit has explained further: "[IDEA] does not require mainstreaming in every case[,] but its requirement that mainstreaming be provided to the maximum extent appropriate indicates a very strong congressional preference." *Roncker* ex rel. *N.R. v. Walter*, 700 F.2d 1058, 1063 (6th Cir. 1983); *see also McLaughlin*, 320 F.3d at 671-72 ("[T]he requirement that the school system provide a disabled child with the least restrictive environment is a mandate favoring mainstreaming, that is, the education of disabled children alongside non-disabled children to the maximum extent appropriate for the individual child.").

37

Here, the congressional preference for mainstreaming is relevant, as only disabled students attended EduCare, while both disabled and non-disabled students attended Larchmont. [Doc. 1-12, at 414-15].[17]

This preference thus militates in favor of finding Larchmont to be D.H.'s LRE. My inquiry, however, does not end there. I must still determine whether the Board could satisfy D.H.'s unique medical and supervisory needs at Larchmont, because: "the mainstreaming requirement may be overcome" in certain situations. *McLaughlin*, *supra*, 320 F.3d at 673 n.4 (citing *Roncker*, *supra*, 700 F.2d at 1063). The Sixth Circuit has identified the factors a court should examine in so determining: "(1) whether the disabled student would benefit from inclusion from [sic] general education, (2) whether such benefits would be outweighed by benefits that are not provided in an inclusive setting, and (3) whether the disabled child disrupts the general education setting." *Id.*

The court in *Roncker* explained: "In a case where the segregated facility is considered superior [to a non-segregated facility], the court should determine *whether the services which make that placement superior could be feasibly provided in a non-segregated setting*. If they can, the

---

[17] The Horens appear to suggest that mainstreaming is only relevant when the school district considers educating a disabled student in the same classroom as non-disabled peers. [Doc. 32, at 4].

This is incorrect. So long as "the special instruction [the student] need[s may be provided] in a setting where [the student] could have *contact* with non-handicapped children]," such as "during lunch, recess and transportation to and from school," the mainstreaming requirement applies and favors placing the child in the school where he or she will have such contact. *Roncker*, *supra*, 700 F.2d at 1061, 1063 (emphasis added); *see also Doe* ex rel. *Doe v. Bd. of Educ. of Tullahoma City Schs.*, 9 F.3d 455, 460 (6th Cir. 1993) ("The school system's proposed placement, on the other hand, offers the child an appropriate placement in a setting that is essentially a modified mainstream educational setting, allowing *maximum contact* with non-handicapped children.").

The congressional preference for mainstreaming thus militates in favor of a disabled student's placement at a school where that child will be in contact with non-disabled students, even if the disabled child will not attend class with non-disabled students. *Roncker*, *supra*, 700 F.2d at 1061, 1063; *Bd. of Educ. of Tullahoma City Schs.*, *supra*, 9 F.3d at 460.

placement in the segregated school would be inappropriate under [IDEA]." 700 F.2d at 1063 (emphasis added).

D.H.'s prior placement at EduCare was due to her medical needs, including supervision and nursing services. [Doc. 3, Exs. Y, at B00470, B00474, B00481-82; Z, at B00486, B00491, B00492, B00498-99]. Such a determination falls under the second of the three factors that may overcome the mainstreaming preference: "whether such benefits would be outweighed by benefits that are not provided in an inclusive setting." *McLaughlin*, *supra*, 320 F.3d at 673 n.4.

In 2006, however, the Board changed D.H.'s placement on the belief that D.H. "was not receiving any [further] medical services at EduCare, any nursing services [that is]." [Doc. 1-13, at 507]. The Board claims: "[T]he Horens and [a physician] had informed the Board that DH had no medical conditions except a seizure disorder which had not manifested itself at school for at least three years and that, as of the 2005-2006 school year, no medical services were needed." [Doc. 45, at 4-5].

The Board appears to base this argument on a comparison of D.H.'s "Background Information" forms, because those for 2003-2005 explicitly mentioned seizures and administration of medication, while that for 2005-2006 did not. *Compare* Doc. 3, Exs. Y, at B00479 ("(4P-) Syndrom, AKA 'Wolf-Hirschhorn' History of seizures, mostly late evening and fever or low grade infection induced. Very sensitive to light, eyes do not dialate."); Z, at B00496 (same), *with* Doc. 3, Ex. ZZ, at B00800 ("4P - Syndrome.").

The difference between the forms does not support the Board's conclusion that D.H. did not have any medical conditions that required medical supervision. This is so because, even aside from Dr. Pappas's testimony, Doc. 1-10, at 104-07, the evidence demonstrates that D.H.'s 4P-Syndrome is itself a seizure disorder, see, e.g., Doc. 3, Exs. AAA, at B00802 (noting that 4P-Syndrome is a

39

"seizure disorder"); GGG; HHH, requiring special medical precautions. Doc. 3, Ex. DDD, at B00799 (D.H.'s school nurse's report – received by the Board "3/2006" – indicating D.H. "does have a history of seizures [and] . . . when [and] if she has one rectal diastat is given [and] 911 is to be called").

The fact that D.H.'s seizures are more infrequent or may occur at night does not mean that they will not occur at school, see *id.*, possibly when there would be no adequate nursing care available at Larchmont. [Docs. 1-11, at 524 ("[Joanne Horen:] Do you recall telling us what the nursing services that were available at Larchmont were? [Maas:] Yes, they're two days a week, and I recall saying that if she came here we'd need to have someone available, you know, it didn't seem like – from what you told me, it did not seem like she needed a one on one nurse but she needed nursing services available because there wasn't anybody to do that procedure should she need it."); 1-12, at 35 (same)].

This concern led both the IHO and SLRO to conclude that Larchmont was inappropriate for D.H. The SLRO, for example, stated:

> she has a seizure disorder which requires the immediate administration of Distat [sic] in the event of a seizure. T. 73-74. Failure to administer the Distat [sic] immediately could ultimately result [in] severe and life-threatening medical consequences for [D.H.]. T. 80-81. Because Distat [sic] must be administered rectally, both the special education teacher and the principal at Larchmont indicated that they would decline to administer the medication in the event of a seizure. This means that the administration of Distat [sic] at Larchmont would fall to the school nurse, who is only in the building two days a week. In short, [D.H.] would have to have a seizure on a day when the nurse would be present which is, of course, not something that is predictable.
>
> TPS has indicated that nursing services could be made available at Larchmont. T. 976, 1124, 1272. However, these services were not included in the most recent IEP, which placed [D.H.] at Larchmont. Without a guarantee that full-time nursing services are available, sending [D.H.] to Larchmont would present too great a risk.

[Doc. 1-19, at 40-41; *see also* Doc. 1-15, at 36 ("[T]he school district initially placed the student at the Educare Center due to her fragile medical condition which required the availability of a nursing staff or trained individuals to administer Diastat.")].

The Board, however, protests: "[I]f the concern of the IHO or SLRO was the remote possibility that DH might experience a seizure during the school day, and require a nurse to administer a suppository medication, then the appropriate remedy was to require the related service of nursing to be made available in the [LRE] – *i.e.*, at an ordinary elementary school such as Larchmont." [Doc. 45, at 8].

The Board is incorrect. The Sixth Circuit has held that a school district's theoretical ability to provide services will not save an otherwise inappropriate IEP if these services are not explicitly included in the written IEP:

> As an initial matter, we note that we must limit our evaluation of Bexley's proposed IEP to the terms of the document itself, as presented in writing to the Knables. The IDEA specifically requires school districts to provide parents a formal written offer before either initiating a placement for a disabled child or otherwise providing a FAPE to the child. *See* 20 U.S.C. § 1415(b)(1)(C). In discussing the importance of the formal written offer requirement, the Ninth Circuit has noted that the requirement is not merely technical, but rather serves the important purpose of creating a clear record of the educational placement and other services offered to the parents. *See Union Sch. Dist. v. Smith,* 15 F.3d 1519, 1526 (9th Cir. 1994). The written offer not only helps to eliminate factual disputes between the school district and parents about proposed placements, but also "greatly assists parents in presenting complaints with respect to any matter relating to the . . . educational placement of the child." *Id.* (internal quotation marks omitted). The written offer requirement should therefore be enforced rigorously. *See id.*
> . . . . .
> *The district court erred in relying on the IHO's finding that Bexley had the capacity to offer Justin an appropriate program. The district court should have limited its assessment to the terms of the draft IEP document itself.* Although there was evidence in the record indicating what could have been provided at Harding, only those services identified or described in the draft IEP should have been considered in evaluating the appropriateness of the program offered.

*Knable*, *supra*, 238 F.3d at 768 (emphasis added).

Here, as the SLRO noted, "these [required medical] services were not included in the most recent IEP, which placed [D.H.] at Larchmont. Without a guarantee that full-time nursing services are available, sending [D.H.] to Larchmont would present too great a risk." [Doc. 1-19, at 40-41]. Examination of the 2006 IEP confirms that D.H.'s change of LRE placement did not include the required provision of any particular medical services at Larchmont. [Doc. 3, Ex. V, at B00439-42].

The SLRO thus correctly concluded that the Board's change of placement from EduCare to Larchmont was improper, and EduCare was D.H.'s LRE "because any marginal benefits received from mainstreaming are far outweighed by the benefits gained from services which could not feasibly be provided in the non-segregated setting" given the services available at Larchmont at the time. *Roncker*, *supra*, 700 F.2d at 1063.[18]

D.H.'s April 3, 2006, IEP – which included a change of placement from EduCare to Larchmont – thus was *not* "reasonably calculated to enable [D.H.] to receive educational benefits." *Deal*, *supra*, 392 F.3d at 853-54 (internal citations omitted).

## IV. Other Issues

---

[18] In so finding, I rely heavily on the findings of the state administrative officers, [Docs. 1-15, at 36-38; 1-19, at 40-41], especially in light of evidence from medical professionals who opined on the issue [Doc. 1-10, at 104-07; Doc. 3, Ex. DDD, at B00799].

As the Sixth Circuit has noted, "the mainstreaming issue imposes a difficult burden on the district court. Since Congress has chosen to impose that burden, however, the courts must do their best to fulfill their duty." *Roncker*, *supra*, 700 F.2d at 1063. Fortunately, I need not make this determination alone: "The district courts are not without guidance insasmuch as they have the benefit of two state administrative proceedings and may justifiably give due weight to those administrative findings." *Id.*; *see also Burilovich*, *supra*, 208 F.3d at 566 ("Indeed, federal courts are generalists with no expertise in the educational needs of handicapped children and will benefit from the factfinding of a state agency, which is presumed to have expertise in the field.").

Indeed, the Sixth Circuit has taken particular care to ensure that district courts assessing mainstreaming accord the state administrative proceedings such "due weight." *E.g.*, *McLaughlin*, *supra*, 320 F.3d at 673; *Roncker*, *supra*, 700 F.2d at 1062.

42

The Board contests two other findings in the SLRO's opinion: 1) upholding the admissibility of Glenn Horen's affidavit; and 2) finding D.H.'s teachers and therapists' tally sheets to be education records under IDEA or FERPA, which the Horens had a right to examine.

## A. Admissibility of Glenn Horen's Affidavit

The Board protests the SLRO's admission of Glenn Horen's affidavit [Doc. 1-18], primarily describing D.H.'s condition and ongoing health problems. The Horens respond that the SLRO could properly consider the affidavit and, further, that the Board "has [presented] no evidence as to whether *any weight* was given the document by the SLRO." [Doc. 32, at 15].

The SLRO held: "Summarily, the  .  .  .  [Horens'] motion to supplement [with Glenn Horen's affidavit] is granted because, as an administrative officer, the relative probative value of the documents will be weighed and, if competent, has been given appropriate consideration." [Doc. 1-19, at 9 n.5].

She, however, did not appear to rely on that affidavit. The Board points out: "The proffered affidavit, if it is relevant at all, is relevant only to a determination of DH's LRE[.]" [Doc. 45, at 19-20]. This statement appears correct, as the affidavit focuses on D.H.'s ongoing medical problems. The SLRO's LRE discussion, however, focused entirely on facts adduced at the IHO hearing, not on the affidavit. [Doc. 1-19, at 40-41].

I thus find that the SLRO did not rely on Glenn Horen's affidavit, and the Board's contention on this point is not well taken. Moreover, to the extent that the SLRO might have so relied, she was entitled – and in fact had a duty – to "[s]eek additional evidence, if necessary." Ohio Admin. Code 3301-51-05(K)(14)(b)(iii)(*c*).[19]

---

[19] I note, parenthetically, that the Board points to virtually identical language once present at Ohio Admin. Code 3301-51-08(H)(3)(c). That subsection – and that of Ohio Admin. Code 3301-

The Board encourages me to adopt a narrow view of "seek" and "necessary" and second-guess the SLRO on this question. I decline to do so as regards the SLRO's consideration of Glenn Horen's affidavit. *Cf. Conley v. N.L.R.B.*, 520 F.3d 629, 639 (6th Cir. 2008) ("[A]dministrative hearings, like the proceeding before the administrative law judge in this labor dispute, are not necessarily bound by the same evidentiary strictures as are federal district courts.").

Because I must independently reexamine the evidence, however, *Metro. Nashville Pub. Schs.*, *supra*, 133 F.3d at 387, and because I *am* bound by the Federal Rules of Evidence, I must determine whether Glenn Horen's affidavit independently deserves weight before me.

Glenn Horen's affidavit is generally consistent with the Federal Rules of Evidence, except for paragraph six, which states:

> On April 20, 2007, we were informed by Dr. Eugene Izsak that "[D.H.] requires continuous observation and assessment during the school day by trained medical personnel so that seizure activity can be immediately detected and addressed. [D.H.] has a malformed and delicate trachea and is very difficult to intubate. Immediate and emergent medical intervention in the even of seizure activity is necessary to prevent the need for intubation."

[Doc. 1-18, at 1 ¶ 6].

This is clear hearsay evidence not covered by a hearsay exception, and it is inadmissible. Fed. R. Evid. 801(c); 802. Such hearsay evidence is even more troubling because it is hearsay expert testimony without a suitable basis – either for establishing reliability of the expert or the testimony itself. Fed. R. Evid. 702; 703.

The SLRO's consideration of Glenn Horen's affidavit – if she gave it any weight, which it appears she did not – was therefore proper, and I may likewise consider the affidavit in my ruling, except for paragraph six.

---

51-08(F)(3) – no longer exists, and does not apply.

**B. Tally Sheets**

The Horens claim they are entitled to inspect Fuelling's tally sheets, because they were: 1) "kept in a cabinet room open to many individuals, not just to the service provider"; 2) "reviewed by the school psychologist"; and 3) "stolen." [Doc. 32, at 15].

The Board responds that the tally sheets are not educational records under either IDEA or the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, because they "were [solely] used [as] a memory aid, were used for the maker's own personal use, and were discarded after being incorporated into DH's records[.]" [Doc. 45, at 22].

IDEA states: "The procedures required by this section shall include . . . [a]n opportunity for the parents of a child with a disability to examine *all records relating to such child*[.]" 20 U.S.C. § 1415(b)(1) (emphasis added); *see also* Ohio Admin. Code 3301-51-04(A) ("Each school district, county board of mental retardation and developmental disabilities . . . and other educational agency shall adopt and implement written policies and procedures . . . that afford parents the opportunity to examine records in accordance with the procedures of 34 C.F.R. 300.610 to 300.628[.]").

The regulations implementing IDEA – and referenced by the Ohio Administrative Code – provide further guidance as to this mandate: "Each participating agency must permit parents to inspect and review *any education records relating to their children that are collected, maintained, or used by the agency under this part*." 34 C.F.R. § 300.613(a) (emphasis added).

FERPA likewise recognizes a parent's right to inspect education records of any educational institution receiving federal funding:

> No funds shall be made available under any applicable program to any educational agency or institution which has a policy of denying, or which effectively prevents, the parents of students who are or have been in attendance at a school of such agency

45

or at such institution, as the case may be, the right to inspect and review the education records of their children.

20 U.S.C. § 1232g(a)(1)(A).

Moreover, "[i]f circumstances effectively prevent the parent . . . from exercising the right to inspect and review the student's education records, the educational agency . . . shall [p]rovide the parent . . . with a copy of the records requested[.]" 34 C.F.R. § 99.10(d)(1). "The educational agency . . . shall respond to reasonable requests for explanations and interpretations of the records." *Id.* § 99.10(c).

The applicable regulations for both IDEA, 34 C.F.R. § 300.613, and FERPA, 34 C.F.R. § 99, define "education records" under 34 C.F.R. § 99. *See also* Ohio Admin. Code 3301-51-04(B)(2) (defining "education records" under 34 C.F.R. § 99 also). Section 99.3(a) of Title 34 of the Code of Federal Regulations defines "education records" as "records that are (1) Directly related to a student; and (2) Maintained by an educational agency or institution or by a party acting or the agency or institution." The section, however, states that "education records" do not include "[r]ecords that are kept in the sole possession of the maker, are used only as a personal memory aid, and are not accessible or revealed to any other person except a temporary substitute for the maker of the record." 34 C.F.R. § 99.3(b)(1).[20]

_____

[20] FERPA uses virtually identical language. 20 U.S.C. § § 1232g(a)(4)(A)-(B).
Before reaching the merits of the Horens' claims, I first note that the Supreme Court has held that FERPA does not create personal rights that an individual may enforce through 42 U.S.C. § 1983. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 287 (2002). Construing *Gonzaga University*, the Sixth Circuit stated: "We limit th[e] conclusion[] that the FERPA imposes a binding obligation on schools that accept federal funds[] to federal government action to enforce the FERPA." *U.S. v. Miami Univ.*, 294 F.3d 797, 809 n.11 (2002). In so stating, the Sixth Circuit relied heavily on the fact that FERPA's obligations are phrased in terms of receiving federal funding, which the United States alone may enforce. *Id.* at 808-09. This reasoning, however, extends equally to attempted enforcement through mechanisms besides § 1983 suits, and I find that the Horens do not have standing to bring suit under FERPA.

46

Finding that the Horens had a right to inspect the tally sheets, the SLRO explained: "OT Nancy LeBlanc testified that she and other therapists used these tally sheets to record what they did with [D.H.] on a daily basis, and also used the form as a billing record for Medicaid. T. 535. Since the tally sheets were used by the school district, the Horens had a right to receive them when requested." [Doc. 1-19, at 36].

The IHO performed a similar analysis: "Mrs. LeBlanc testified to the use of tally sheets in the services she provided to the student. (R-536). Tally sheets are used to keep track of each student. (R-537). No tally sheets were included within the records provided on request to the [Horens]." [Doc. 1-15, at 58].

The Horens, SLRO and IHO, however, skip a necessary step: determining that the school "maintain[s]" the tally sheets. 34 C.F.R. § 99.3(a)(2). Interpreting language in FERPA that is virtually identical to 34 C.F.R. § 99.3(a)(2), the Supreme Court held that student-graded assignments were not "maintained" by the institution and thus not "education records." *Owasso Indep. Sch. Dist. No. I-011 v. Falvo*, 534 U.S. 426, 435-36 (2002). The Court explained:

> The word 'maintain' suggests FERPA records will be kept in a filing cabinet in a records room at the school or on a permanent secure database, perhaps even after the student is no longer enrolled. The student graders only handle assignments for a few moments as the teacher calls out the answers. It is fanciful to say they maintain the papers in the same way the registrar maintains a student's folder in a permanent file.

*Id.* at 432-33.

While the student-graded assignments in *Falvo* were even more transient than the tally sheets at issue here, the same rationale applies. Like the student-graded assignments, the tally sheets were

---

Because IDEA's regulations incorporate the same language and dictates as those of FERPA on this issue, 34 C.F.R. § 300.613, however, and because IDEA contemplates private suits to enforce it, 20 U.S.C. § 1415(e), an individual's inability to sue under FERPA for access to education records will be of little practical significance as long as the individual sues also under IDEA.

temporary vehicles assisting school staff in memorializing notes in the students' permanent records, but never themselves went into a "records room," the student's "permanent file," or on "a permanent secure database." *Id.*

The tally sheets were thus not "maintained" as that term is used in 34 C.F.R. § 99.3(a)(2) as incorporated into IDEA through 34 C.F.R. § 300.613.

Having so found, I hold that the tally sheets were not "education records" to which the Horens were entitled under IDEA or FERPA.

Nevertheless, even assuming the tally sheets were "maintained" by the institution, the "personal use" exception to the definition of "education records" applies here.

As noted above, the regulations exempt from the definition of "education records" any records "kept in the sole possession of the maker, are used only as a personal memory aid, and are not accessible or revealed to any other person except a temporary substitute for the maker of the record[.]" 34 C.F.R. § 99.3(b)(1).

The Horens thus have the burden of submitting evidence that the tally sheets were not: 1) kept in the sole possession of the maker; 2) used as a personal memory aid; or 3) inaccessible or revealed to any other person except a temporary substitute. They need only establish one of the three elements to render inapplicable the exception to the definition of "education records."*Id.*

The Horens fail to do so. The Horens do not point to any evidence in the record demonstrating that the tally sheets qualify as records to which they are entitled. Both the IHO and SLRO, meanwhile, appear to ground their arguments simply on LeBlanc's testimony.

LeBlanc, however, merely testified that the tally sheets were "how we keep our records," and that they served solely as a "record keeping" basis for their reports. [Doc. 1-10, at 710-11; *see also* Doc. 35-2, at 1-2 ("When I am working with a student I make *personal notes* to tally the number of

48

times a student performs a certain action  .   .   .   . *I would use my tally notes to complete the Medicaid forms and sometimes to complete quarterly progress reports* regarding one of my students. After incorporating my tallies into those other records, *I destroyed or discarded the notes*." (Dykyj's affidavit) (emphasis added)].[21]

The Board – attempting to find some evidentiary basis for the Horens' claims on this issue so it may respond – suggests that the Horens may be referencing Fuelling's testimony that she keeps "notebooks" and "tally sheets[.]" [Doc. 1-13, at 263-64].[22]

------

[21] The full portion of LeBlanc's relevant testimony is:

> [Joanne Horen:] And is it your understanding that [D.H.] could tell us what happened with her?
> [LeBlanc:] No. There's tally sheets on that and our individual notes.
> [Joanne Horen:] There's tally sheets available on what?
> [LeBlanc:] The classroom [teacher] keeps her tally sheet on what she does.
> [Joanne Horen:] There's a tally sheet, and if I told you I've never seen that tally sheet, would you have any reason to disagree with me on that?
> [LeBlanc:] That's how we keep *our records*.
> [Joanne Horen:] So there's a tally sheet available on [D.H.] as to the services that she's received?
> [LeBlanc:] Uh-huh, for activities.
> [Joanne Horen:] Okay. And if I told you I've never seen such a tally sheet in her records, would that surprise you?
> [LeBlanc:] *No, because our reports are written off our daily notes.*
> [Joanne Horen:] What does that have to do with a tally sheet on [D.H.]?
> [LeBlanc:] *That's for our record keeping. That's how we keep track of each student.*

[Doc. 1-10, at 710-11 (emphasis added)].

[22] The full portion of Fuelling's relevant testimony is:

> [Joanne Horen:] Are you aware of any documents that would be called charting information?
> [Fuelling:] Documents, no.
> [Joanne Horen:] Any documentation? So if Mr. Felt stated that he got some information from charting, do you know what he would be speaking of?
> [Fuelling:] Probably like my notebooks that I keep on the kids. When I work with them, I'll write down, you know --

49

Her testimony does not suggest, however, that she shows her notebooks – tally sheets or otherwise – to anyone, but merely explains that she keeps such information. [*Id.*; *see also* Doc. 35-1, at 2 ("When I worked with DH on the goals and objectives in her IEP, I would often make *personal notes for myself* to tally the number of times she did certain things, or how much assistance she needed to do a certain task, and so on. *I kept these notes in my classroom in the notebook I kept for DH. I used them as my resource to verify my accuracy when I prepared periodic progress reports* for my students." (emphasis added))].

Further, the Horens' bald claim that the school psychologist – I assume they mean Felt – reviewed the tally sheets, is not the same as pointing to *evidence* thereof.

In *J.P.* ex rel. *Popson v. West Clark Cmty. Schs.*, 230 F. Supp. 2d 910, 949, the court stated:

> In the first place, this Court is not persuaded that [a teacher]'s personal teaching notes constitute 'educational records' in the sense intended by [FERPA]. And, in the second place, the fact that one teacher has a *habit* of throwing out such notes at the end of each school year does not establish the existence of a *school-wide policy* or *practice* of throwing them out.

In *K.C. v. Fulton County Sch. Dist.*, 2006 WL 1868348, *10 (N.D. Ga.), meanwhile, the court held that a teacher's "personal notes" were "education records" because they were "accessible to individuals other than a teacher or substitute." The court explained: "Here, however, Ms. Gray testified that she allowed [another student]'s mother to review these notes at the end of every session with [that other student]." *Id.*

---

[Joanne Horen:] What's in those notebooks?
[Fuelling:] In the notebooks that I keep for the kids?
[Joanne Horen:] Yes.
[Fuelling:] Their IEP, tally sheets, their medical packet, documentation sheets for G-tube feedings and suctioning, the latest MFE.

[Doc. 1-13, at 263-64].

Here, like *J.P.* and unlike *K.C.*, the Horens have presented no evidence that anyone other than the creating individual had possession of, viewed, or had access to the tally sheets. 34 C.F.R. § 99.3(b)(1). The Horens have likewise failed to show that the tally sheets were anything other than a "personal memory aid." *Id.* The Board's employees quoted above indicated that the tally sheets were a personal aid to assist them in drafting permanent records, and not themselves intended to go into the students' records or be used by others besides the creator.

Even according the state officers due deference on this determination, I thus find that the Horens have not shown that the tally sheets constitute "records" or "education records" under IDEA or FERPA.

Having so concluded, I hold that the Horens had no right to them and suffered no prejudice from the Board's destruction thereof.

Moreover, even were the tally sheets records to which the Horens entitled, they have failed to show that this failure "seriously infringed" on their ability to participate in D.H.'s IEP process, *Knable*, *supra*, 238 F.3d at 765, as they received the information underlying the tally sheets and incorporated into D.H.'s reports and Medicaid forms.

Having failed to make this showing, the Horens have not stated a procedural violation or a denial of a FAPE on this issue. *Id.*

## V. Appropriate Relief

There remains solely the determination of what relief is appropriate for the violation I found to deny D.H. a FAPE:[23] the Board's failure to involve the Horens adequately in D.H.'s April 3, 2006,

---

[23] As I found no IDEA violations regarding the Summer 2004 ESY services or gratuitous services provided during 2004-2005, see Part I, *supra*, I do not order relief as to those issues. I also found no violation – and thus no relief appropriate – for the Board's failure to allow the Horens to examine the tally sheets. *See* Part IV.B.

51

IEP meeting, which changed her placement from EduCare to Larchmont. This is especially significant because EduCare – not Larchmont – constitutes D.H.'s LRE.

The SLRO held:

The IHO's decision that TPS' denial of parental participation in the April 3, 2006 IEP meeting amounted to a violation of FAPE was not challenged in this appeal, and, thus, that decision stands.[24] Thus, the IHO was ordering three months of compensatory education for the denial of parental participation in the April 3, 2006 IEP meeting.

[Doc. 1-19, at 42].[25]

The Horens seem to argue that such compensation is justified, notwithstanding the SLRO or IHO's determinations.

The Board responds, in effect: "No harm, no foul." In so doing, the Board notes that it offered D.H. continued placement at EduCare under the "stay-put" provision, or otherwise. The Board further points out that, notwithstanding this offer, the Horens chose to keep D.H. at home.

Under IDEA, I may grant "such relief as [I] determine[] is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). Any such relief constitutes an equitable remedy. *L.M.*, *supra*, 478 F.3d at 316. The Supreme Court has thus stated that "equitable considerations are relevant in fashioning relief, and the [district] court enjoys broad discretion in so doing." *Florence County Sch. Dist. Four v. Carter* ex rel. *Carter*, 510 U.S. 7, 16 (1993). I should, however, "consider all relevant factors[.]" *Id.*

As to the aim of such relief, the Sixth Circuit has held: "An appropriate award of compensatory education is relief designed to ensure that the student is appropriately educated within

---

[24] I have already held this SLRO determination to be erroneous. *See* Part II.A, *supra*.

[25] It is unclear from where in the IHO's opinion the SLRO draws this conclusion, as even the Horens seem to imply. [Doc. 32, at 16 ("Whether the SLRO erred in finding that the IHO ordered three months of compensatory education for the denial of parental participation in the April 3, IEP meeting is inconsequential.")].

the meaning of the IDEA." *L.M.*, *supra*, 478 F.3d at 316 (internal quotation omitted). Furthermore, "compensatory awards should aim to place disabled children in the same position they would have occupied but for the school district's violations of IDEA," not to "punish[] . . . the School District[.]" *Id.* at 317 (internal quotation omitted); *cf. Pohorecki*, *supra*, 637 F. Supp. 2d at 555 ("[H]ere, because the May 2007 IEP was never implemented, J.C. suffered no harm.").

Here, the harm to D.H. stems from her improper change of placement from EduCare to Larchmont without her parents' input. The Board, however, never actually implemented this change. When the Horens learned of the decision regarding Larchmont – and before the Board implemented it – they filed their due process complaint in which they expressed a desire that D.H. remain at her "stay-put"[26] placement at EduCare. [Doc. 3, Ex. A, at B01165].

Billau sent the Horens a letter confirming this stay-put placement the following week and offering D.H. placement at either EduCare or Larchmont, as the Horens desired:

> Your due process complaint, filed last week, indicated that you intended to keep [D.H.] at the Educare location as a "stay-put" placement while the due process proceeds, rather than send her to Larchmont Elementary School. However, during the first four (4) days of school you did not send [D.H.] to school at either Larchmont Elementary or the Educare facility. . . . The District is currently holding places for her both at Larchmont Elementary School [and] . . . at the Educare facility.

[Doc. 3, Ex. LL].

The Horens responded to Billau's letter with an email, indicating receipt of his letter but an intent to keep D.H. home from EduCare – or at least to "seek[] other options" – "until such time as

---

[26] IDEA contemplates that, "during the pendency of any proceedings conducted pursuant to [the filing of a due process complaint or afterwards], . . . the child shall remain in the then-current educational placement of the child[.]" 20 U.S.C. § 1415(j).

As the Horens filed their due process complaint on August 28, 2006, and D.H.'s change of placement to Larchmont did not become effective until August 30, 2006, [Doc. 3, Ex. V, at B00439], her "stay put" placement was EduCare.

53

we were notified that Kellie Fuelling, who poses a substantial risk of harm to [D.H.]'s well-being and care, would not in any way, have any contact with [D.H.] or any authority whatsoever over anything related to [D.H.]'s education or care in the primary program at EduCare." [*Id.*].

As the SLRO observed, the Horens have since kept D.H. home from EduCare:

> During the pendency of this action, [D.H.]'s parents have refused to send her to either of the placements made available to her by TPS, while the educators, who seem ready and willing to educate [D.H.], have spent more time dealing with the Horens' numerous complaints than they have educating [D.H.], albeit because the parents withdrew [D.H] from school and didn't give them the opportunity.

[Doc. 1-19, at 43].

Through its actions, the Board thus demonstrated that it left the option open to the Horens to continue to send D.H. to EduCare, as would have been the case but for the April 3, 2006, IEP. *L.M.*, *supra*, 478 F.3d at 317. There is nothing further the Board could do "to ensure that [D.H. was] appropriately educated within the meaning of the IDEA." *Id.* at 316. As the SLRO pointed out, her lack of education since that time has been a direct consequence of her parents' actions, not the Board's.

The Horens' justification for doing so – their distrust of Fuelling – is not properly before me, because they have not raised it as an issue on appeal. *E.g.*, *A.K.* ex rel. *J.K. v. Alexandria City Sch. Bd.*, 484 F.3d 672, 679 n.7 (4th Cir. 2007); *Woods* ex rel. *T.W. v. N.J. Dep't of Educ.*, 796 F. Supp. 767, 775 (D.N.J. 1992) ("[P]ursuant to the IDEA, failure to raise an issue at the administrative level will result in a waiver of the issue on appeal to a United States District Court."). It is thus not an appropriate factor for me to consider at this stage.

Thus, notwithstanding the SLRO's determination to the contrary and giving it "due weight," I find that the Board's violation merits no award of relief in the circumstances before me. In so

finding, I have considered the relevant circumstances and factors militating for and against an award of relief, and determined that no such award is justified here.

Because the Horens, for the reasons stated above, are not entitled to relief, final judgment shall be entered in favor of plaintiff and against defendants, notwithstanding the violations attendant on the April 3, 2006, IEP meeting and its outcome. Any injury thereby caused to D.H. could, had her parents acted otherwise, have been avoided entirely.

**Conclusion**

For the foregoing reasons, it is hereby:

ORDERED THAT:

1. Plaintiff's motion to strike [Doc. 46] be, and the same hereby is, granted;

2. Defendants' motion for summary judgment [Doc. 32] be, and the same hereby is, granted in part and denied in part; and

3. Plaintiff's motion for partial summary judgment [Doc. 35] be, and the same hereby is, granted, and the compensatory education ordered by the SLRO for the violations noted herein be vacated.

The Clerk shall enter final judgment accordingly.

So ordered.

s/James G. Carr
U.S. District Judge
